WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Ortiz,<br><br>                    Plaintiff,<br><br>v.<br><br>Zurich American Insurance Company; Sedgwick Claims Management Services, Inc.; Kelly Thompson; XYZ Corporations; John Does 1-26,<br><br>                    Defendants. | No. CV-13-02097-PHX-JAT<br><br>**ORDER** |

Pending before the Court are Zurich American Insurance Company ("Defendant")'s[1] Motion for Summary Judgment RE: Punitive Damages (Doc. 94) and Motion to Strike Portions of the Declaration of Everette Lee Herndon, Jr. (Doc. 106). The Court has considered the pleadings and now rules on the motions.

**I.    Motion to Strike**

The Court first considers Defendant's motion to strike because, if granted, it would narrow the evidence before the Court in considering Defendant's motion for partial summary judgment. In Plaintiff's response to Defendant's partial summary judgment motion, he submitted a declaration by expert witness Everette Lee Herndon, Jr. *See* (Doc. 100-2). Defendant moves to strike six paragraphs of Mr. Herndon's declaration. *See* (Doc. 106).

---

[1] All other Defendants have been dismissed from this action. *See* (Docs. 9, 31, 57).

### A. Legal Standard

Local Rule of Civil Procedure for the District of Arizona ("Local Rule") 7.2 governs the filing of motions to strike and provides that "a motion to strike may be filed only if it is authorized by statute or rule . . . or if it seeks to strike any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order." LRCiv 7.2(m)(1). Further, "[a]n objection to (and any argument regarding) the admissibility of evidence offered in support of or opposition to a motion must be presented in the objecting party's responsive or reply memorandum and not in a separate motion to strike or other separate filing." *Id.* 7.2(m)(2).

### B. Analysis

Before reviewing the merits of Defendant's motion to strike, the Court must first determine if the motion is procedurally proper under Local Rule 7.2(m). Defendant asserts in its motion that the Court should strike certain portions of Mr. Herndon's declaration because it "violates the Court-ordered expert and discovery deadlines." (Doc. 106 at 2). Thus, Defendant argues that portions of the declaration are prohibited by a court order, satisfying Local Rule 7.2(m)(1).

On the other hand, Defendant is unable to explain how its motion satisfies Local Rule 7.2(m)(2). In essence, Local Rule 7.2(m)(2) bars motions to strike if the objection could have been made in a responsive pleading. Here, Plaintiff submitted Mr. Herndon's declaration with his response to Defendant's motion for partial summary judgment. Defendant, therefore, was required to object to Mr. Herndon's declaration in its "reply memorandum and not in a separate motion to strike." LRCiv 7.2(m)(2).

For the foregoing reason, the Court will deny Defendant's motion to strike.

## II. Factual Background

This lawsuit arises from an injury Plaintiff David Ortiz sustained on August 7, 2012 while he worked as a cook at Starwood Hotels & Resorts ("Starwood") in Phoenix, Arizona. At the time, Starwood was covered by a workers' compensation insurance policy issued by Defendant and adjusted by Sedgwick Claims Management Services, Inc.

("Sedgwick"). Although Plaintiff eventually received the benefits to which he was entitled, he encountered several obstacles along the way. As an initial matter, the Court must determine the undisputed material facts in this case.

### A.     Parties' Statements of Facts

To supplement its summary judgment motion, Defendant filed a Separate Statement of Facts in Support of Motion for Summary Judgment ("DSOF"). (Doc. 95). Plaintiff then filed a Response to Defendant's Motion for Partial Summary Judgment RE: Punitive Damages (Doc. 98), a Response to Defendant's Separate Statement of Facts (Doc. 99), and his own Separate Statement of Facts (Doc. 100). Finally, Defendant filed a Reply in Support of Its Motion for Summary Judgment RE: Punitive Damages (Doc. 103) and a Controverting Statement of Facts (Doc. 104).

Local Rule 56.1(a) requires that a party moving for summary judgment file a separate statement of facts, in addition to the motion, setting forth each material fact on which the party relies in support of its motion. LRCiv 56.1(a). In addition, the rule requires that each material fact be numbered in a separate paragraph and refer to admissible portions of the record for that fact. *Id.* Similarly, Local Rule 56.1(b) requires a party opposing a motion for summary judgment, the non-movant, to file a controverting statement of facts in addition to its response to the motion. *Id.* 56.1(b). In the controverting statement of facts, the non-movant must address each of the material facts that the moving party put forth and, if disputed, include "a reference to the specific admissible portion of the record supporting the party's position." *Id.* Moreover, if the non-movant wishes the court to consider "any additional facts that establish a genuine issue of material fact," it must set forth each additional fact in a separately numbered paragraph with a reference "to a specific admissible portion of the record where the fact finds support." *Id.*

#### 1.     Plaintiff's "Response to Defendant's Separate Statement of Facts" (Doc. 99)

In addition to its motion for partial summary judgment, Defendant filed its DSOF

1 in compliance with Local Rule 56.1(a), which includes sixty-nine separately numbered
2 material facts spanning nine pages. *See* (Doc. 95). Accompanying his response to
3 Defendant's motion, Plaintiff filed two independent statements of facts, *see* (Docs. 99,
4 100), the first of which attempts to address each of the material facts as set forth in
5 DSOF. *See* (Doc. 99). Plaintiff labelled this filing "Plaintiff's Response to Defendant's
6 Separate Statement of Facts." (*Id.*) Plaintiff, however, did not support any of his
7 "disputes" with a citation to the record. *See* (*id.*) Local Rule 56.1(b) clearly requires any
8 facts that the non-movant disputes to be accompanied with "a reference to the specific
9 admissible portion of the record supporting the party's position." LRCiv 56.1(b). A
10 party's failure to provide such references permits the Court to: 1) give the party an
11 opportunity to properly support or address the fact; 2) consider the fact undisputed for
12 purposes of the motion; 3) grant summary judgment if the movant is entitled to it; or 4)
13 issue any other appropriate order. Fed. R. Civ. P. 56(e); *see Szaley v. Pima Cty.*, 371 F.
14 App'x 734, 735 (9th Cir. 2010) ("The district court permissibly deemed Defendant's
15 statement of facts to be true because Plaintiff failed to comply with Local Rule 56.1(b).").

16 The Court is not expected or required to scour the record on Plaintiff's behalf to
17 find support for his disputes. *See Schneider v. TRW, Inc.*, 938 F.2d 986, 990 n.2 (9th Cir.
18 1991) ("[T]he law of this circuit . . . recognizes that a district court is under no obligation
19 to mine the full record for issues of triable fact."); *Nilsson, Robbins, Dalgarn, Berliner,*
20 *Carson & Wurst v. La. Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988) ("We hold that
21 when a local rule . . . has been promulgated, it serves as adequate notice to nonmoving
22 parties that if a genuine issue exists for trial, they must identify that issue and support it
23 with evidentiary materials, without the assistance of the district court judge."). Even after
24 examining Plaintiff's disputes, the Court finds that each alleged dispute either relates to
25 an immaterial fact or is flatly unsupported by the record. Accordingly, for purposes of
26 this Order, the Court will construe all facts as set forth in DSOF (Doc. 95) as true. *See*
27 Fed. R. Civ. P. 56(e)(2); *Szaley*, 371 F. App'x at 735.

28

### 2. Plaintiff's "Separate Statement of Facts" (Doc. 100)

In addition to his "Response to Defendant's Separate Statement of Facts," Plaintiff also filed a "Separate Statement of Facts." *See* (Doc. 100). This statement of facts does not respond to DSOF, but sets forth Plaintiff's account of the material facts along with citations to the record. *See* (*Id.*) The Court finds that Plaintiff's Statement of Facts adequately complies with Local Rule 56.1(b) as an attempt to propose "any additional facts that establish a genuine issue of material fact."

In order to "assist the Court in tracking the facts at issue and each party's position in response thereto," Defendant then filed a "Controverting Statement of Facts" in response to Plaintiff's Separate Statement of Facts. (Doc. 104 at 2). Though well-intended, Local Rule 56.1 does not provide for a reply statement of facts or a response to the non-moving party's separate statement of facts. Rather, Local Rule 7.2(m)(2) provides that any objection to the non-moving party's statement of facts must be made in a "reply memorandum and may not be presented in a separate responsive memorandum." LRCiv 7.2(m)(2); *see EEOC v. Autozone, Inc.*, 2008 WL 2509302, at *1 (D. Ariz. June 19, 2008) ("Should a moving party have any objections or replies to arguments or facts made in the Response or its supporting statement of facts, these 'must be included in the responding party's reply memorandum for the underlying motion and may not be presented in a separate responsive memorandum.'" (quoting LRCiv 7.2(m)(2))). The Local Rules do not contemplate attaching additional exhibits to replies in support of summary judgments or filing a separate response to the non-moving party's statement of facts. The Court, therefore, will only consider the objections Defendant made in its Reply (Doc. 103) and not those contained in its Controverting Statement of Facts (Doc. 104).

Accordingly, for purposes of this Order, the Court will view all facts as described in DSOF (Doc. 95) and any properly supported additional facts found in Plaintiff's Separate Statement of Facts (Doc. 100) in the light most favorable to Plaintiff. *See Ellison v. Robertson*, 357 F.3d 1072, 1075–76 (9th Cir. 2004).

**B.     The Undisputed Material Facts**

The undisputed facts show that Plaintiff suffered an on-the-job injury during an incident with his supervisor on August 7, 2012. (Doc. 99 at 1). Although Plaintiff claimed that he fell when his supervisor pushed him, two witnesses stated the supervisor merely pulled away from a hug, causing Plaintiff to lose his balance. (*Id.* at 2). The difference is of no matter to the outcome of this case. At the time of the incident, Starwood was covered by a workers' compensation insurance policy issued by Defendant and adjusted by Sedgwick. (Doc. 100 at 2).

For one week following the incident, Plaintiff continued to work without official complaint. (*Id.*) On August 15, 2012, Plaintiff first reported his injury to Starwood and started to receive medical treatment from U.S. Healthworks. (Doc. 99 at 1–2). About one month after Plaintiff began his medical treatment with U.S. Healthworks, he was referred to an orthopedic surgeon. (*Id.* at 2). On September 19, 2012, Defendant first received notice of Plaintiff's workers' compensation claim. (*Id.*) Because Plaintiff had been released to "light duty" and continued to work, Sedgwick initially designated Plaintiff's claim as "medical-only" and assigned the claim to an adjuster named Lisa Miller. (*Id.*).

On September 24, 2012, Dr. Brian L. Shafer of Arizona Bone and Joint Specialists examined Plaintiff. (*Id.*) Based on this evaluation, Dr. Shafer advised Plaintiff to undergo an MRI to determine whether he injured his right rotator cuff. (*Id.*) The ensuing MRI indicated a full-thickness tear of Plaintiff's rotator cuff, leading Dr. Shafer to recommend reparatory surgery. (*Id.* at 2–3). Upon receiving an authorization request for surgery, Sedgwick re-titled the claim as an "indemnity" claim and transferred it to Kelly Thompson ("Thompson"). (*Id.* at 3).

After Thompson took Plaintiff's statement, obtained witness statements and reviewed Plaintiff's medical records, she requested authority from her supervisor to deny the claim. (*Id.* at 3–4). In her claim note, Thompson provided a myriad of reasons for her denial recommendation, including: conflicting accounts of the incident; Plaintiff's existing limp and unsteady intrinsic balance; Plaintiff's delay in seeking treatment;

Plaintiff's indications of feeling "fine" for one week after the incident; Plaintiff's prior motor vehicle accident that resulted in a shoulder injury; and Plaintiff's engagement in soccer as an extracurricular activity. (*Id.*) On October 29, 2012, Thompson issued a Notice of Claim Status with the Industrial Commission of Arizona ("ICA") denying Plaintiff's claim. (*Id.* at 4). Soon thereafter, Thompson told Plaintiff in a telephone conversation that his claim was being denied because the circumstances of the incident did not fall within the course and scope of his employment. (*Id.* at 4–5).

On November 28, 2012, Plaintiff filed a Request for Hearing before the ICA to challenge Sedgwick's denial of benefits. (*Id.* at 5). Plaintiff's principal argument was that, contrary to Thompson's belief, his injury occurred in the course and scope of his employment. (*Id.*) Sedgwick hired Julie Doherty ("Doherty") of Klein, Doherty, Lundmark, Barberich & La Mont, P.C. to defend against Plaintiff's claim. (*Id.*) In her initial case report, Doherty promised to depose Plaintiff, explore his medical history, obtain relevant medical records and schedule an independent medical examination ("IME"). (*Id.*) After Doherty deposed Plaintiff, she advised Thompson that "In my opinion, the possibilities are extremely great that the Judge will find for [Plaintiff]." (*Id.* at 6). Doherty also told Thompson that she believed Plaintiff's injury occurred in the course and scope of his employment. (*Id.*) Thompson disagreed with Doherty, expressly rejecting her conclusion that Plaintiff's injury occurred in the course and scope of his employment. (*Id.*; Doc. 100-14).

On January 24, 2013, Thompson retained Scott Houston ("Houston") of Jardine, Baker, Hickman, and Houston to replace Doherty as Sedgwick's counsel. (Doc. 99 at 6–7). In Houston's preliminary case analysis, he questioned whether the "nature of the physical injury involved" could cause Plaintiff's torn rotator cuff and whether the injury occurred in the course and scope of Plaintiff's employment. (*Id.* at 7; Doc. 95-3 at 119). To obtain a second medical opinion, Houston scheduled Plaintiff to undergo an IME by Dr. Neil Rockowitz. (Doc. 99 at 7). On February 21, 2013, Dr. Rockowitz issued his IME report concluding that, based on the information available for his review, Plaintiff's

1   injury and need for surgery were related to the August 7, 2012 incident. (*Id.* at 8).

2   On February 28, 2013, Houston advised Thompson that, based on deposition
3   testimony from two witnesses, Plaintiff's injury likely occurred within the course and
4   scope of his employment. (Doc. 100 at 4). Houston also remarked, however, that he
5   remained skeptical about "medical causation." (Doc. 95-3 at 131). Specifically, Houston
6   questioned how Plaintiff could have worked for one week without complaint while
7   suffering from a torn rotator cuff. (Doc. 99 at 7–8).

8   The first hearing before the ICA occurred on March 6, 2013. (*Id.* at 8). Plaintiff
9   testified that he struck the back of his right shoulder on the lower hinge of the freezer
10  door when he fell and denied falling on an "outstretched" arm or elbow. (*Id.*) After the
11  hearing, Houston had a telephonic conference with Dr. Rockowitz to discuss the
12  mechanism of injury in light of Plaintiff's testimony. (*Id.*) During this conference, Dr.
13  Rockowitz—contrary to his earlier IME report—expressed that, based on Plaintiff's
14  testimony, the rotator cuff injury could not have resulted from the incident. (*Id.* at 8–9).

15  A second ICA hearing took place on June 6, 2013. (*Id.* at 9). Dr. Shafer testified at
16  this hearing and concluded that, although he did not have all of the information relating to
17  Plaintiff's injury available to him at the time of his initial evaluation, the incident as
18  described in Plaintiff's testimony could have caused the rotator cuff injury. (*Id.*)

19  On June 26, 2013, Dr. Rockowitz testified at the final ICA hearing. (*Id.*) During
20  his testimony, Dr. Rockowitz attested that the mechanism of Plaintiff's injury could not
21  have supplied the necessary force to cause a full thickness tear of his rotator cuff. (*Id.* at
22  10). Instead, he testified that some tension or stress on the extremity would have been
23  necessary to cause the injury. (*Id.*) The case was then submitted for decision. (*Id.*)

24  On August 29, 2013, Judge Mosesso rendered his decision finding that Plaintiff's
25  claim was compensable. (*Id.*) Defendant did not appeal the award and accepted Plaintiff's
26  claim. (*Id.*) Plaintiff then brought this lawsuit alleging the following four claims for
27  relief: 1) breach of the duty of good faith and fair dealing as to Defendant; 2) aiding and
28  abetting Defendant's breach of the duty of good faith and fair dealing as to Sedgwick; 3)

8

aiding and abetting Defendant's breach of the duty of good faith and fair dealing as to Thompson; and 4) punitive damages as to Sedgwick, Thompson and Defendant. (Doc. 9). In a previous Order, the Court dismissed all of Plaintiff's claims against Sedgwick and Thompson. *See* (Doc. 57). Plaintiff's remaining punitive damages claim—against Defendant—is the only claim on which Defendant seeks summary judgment.

### III. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A) & (B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. To be entitled to summary judgment, the movant must support its motion with evidence that would entitle it to a directed verdict at trial, *id.* (citing Fed. R. Civ. P. 50(a)); i.e., the party must show that "a reasonable jury would not have sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The burden then shifts to the non-movant to establish the existence of material fact. *Celotex Corp.*, 477 U.S. at 323. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"

1 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

### IV. Punitive Damages Claim

#### 1. Legal Standard

"Punitive damages primarily further the same objectives underlying criminal law: punishing the defendant and deterring the defendant and others from future misconduct." *Gurule v. Ill. Mut. Life & Cas. Co.*, 152 Ariz. 600, 601, 734 P.2d 85, 86 (1987) (en banc) (citing *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986)). In the context of an insurance bad faith claim, punitive damages are available only when the evidence reflects, by clear and convincing evidence, "something more" than the conduct necessary to establish the tort. *Rawlings v. Apodaca*, 151 Ariz. 149, 160, 726 P.2d 565, 576 (1986); *see Linthicum*, 150 Ariz. at 332, 723 P.2d at 681. More specifically, punitive damages are appropriate "when, *and only when*, the facts establish that defendant's conduct was aggravated, outrageous, malicious or fraudulent." *Id.* at 162, 726 P.2d at 578 (citing *Anderson v. Cont'l Ins. Co.*, 85 Wis. 2d 675, 271 N.W.2d 368 (1978)). In other words, an "evil mind" must guide an "evil hand." *Id.*

Notably, while "[i]ndifference to facts or failure to investigate [may be] sufficient to establish the tort of bad faith[, such conduct] may not rise to the level required by the punitive damage rule." *Id.* Rather, in addition to such indifference or failure to investigate, the plaintiff must also show that the insurer was "guided by an evil mind which either consciously sought to damage the insured or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to the insured." *Id.* Put

another way, a court should consider "the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred[,] . . . [t]he duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm, and any concealment of it." *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 497, 733 P.2d 1073, 1080 (1987).

Because an insurer is rarely "willing to take the stand and admit its 'evil mind,'" however, circumstantial evidence is often the only way a plaintiff can prove he is entitled to punitive damages. *Id.* at 498, 733 P.2d at 1081. "Thus, whether the [insurer] intended to injure the plaintiff or consciously disregarded the plaintiff's rights may be suggested by a pattern of similar unfair practices." *Id.* In any event, the primary question when punitive damages are requested is motive, because gross negligence and reckless disregard are not enough. *See Volz v. Coleman Co., Inc.*, 155 Ariz. 567, 570–71, 748 P.2d 1191, 1194–95 (1987).

**2.   Analysis**

Defendant argues that it is entitled to summary judgment as to Plaintiff's punitive damages claim because Plaintiff is unable to establish that Defendant acted with the requisite "evil mind" to support punitive damages. (Doc. 94). Defendant asserts that even if its conduct supports Plaintiff's insurance bad faith allegations, which it does not concede, this alone is insufficient for an award of punitive damages. (*Id.*)

To establish a claim for punitive damages, the evidence must show that Defendant either: (1) intended to cause injury; (2) engaged in wrongful conduct motivated by spite or ill will; or (3) acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others, even though Defendant had neither desire nor motive to injure. *See Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 422, 758 P.2d 1313, 1324 (1988).

Plaintiff does not appear to contend that either of the first two avenues applies in this case. To the extent Plaintiff did so, the Court finds that no evidence has been presented to show that Defendant "intended to cause injury" or "engaged in wrongful

11

1  conduct motivated by spite or ill will." Accordingly, the Court will focus its analysis on
2  the third avenue. In this regard, Plaintiff alleges that Defendant consciously disregarded a
3  substantial risk of significant harm to Plaintiff's rights because it placed its financial
4  interests above Plaintiff's interests by crafting an incentive for claims adjusters to close
5  claims without regard to a claim's merits, "attorney-shopped," and improperly persuaded
6  Dr. Rockowitz to "flip" his opinion regarding medical causation. (Doc. 98).

7  Plaintiff first alleges that a monetary bonus program implemented by Starwood
8  and paid to Sedgwick claims adjusters imposed "arbitrary and unreasonable pressure" on
9  the adjusters to deny an injured worker's claim without regard to the claim's merits.
10 (Doc. 98 at 1). Plaintiff contends that the program "improperly" incentivized Thompson
11 to deny Plaintiff's workers' compensation claim. (*Id.*)[2] Even if the allegedly tainted
12 program created a slight incentive for claims adjusters to *close* claims, however, Plaintiff
13 presents no evidence that the program encouraged adjusters to *deny* claims. Further,
14 satisfying the minimum "year-end closing ratio" was only one of several conditions to be
15 eligible for a bonus. The program included multiple other requirements—such as internal
16 audit scores and a maximum 5% reopen rate—that undoubtedly would have been
17 compromised if an adjuster closed a claim incorrectly. Finally, there is no evidence that
18 Defendant placed "arbitrary or unreasonable pressure" on Thompson or any other claims

---

[2] As outlined in Plaintiff's papers (Doc. 98 at 12) and the bonus program itself (Doc. 100-8 at 1), the program would seemingly encourage adjusters to *not* close claims. Specifically, the program requires that an adjuster's "year-end closing ratio must be at least 105%" to be eligible for a bonus. (Doc. 100-8 at 1). According to Plaintiff and the program description, the "Year-end closing ratio = total # of intake / total # of closures during the year." (*Id.*) If this equation were applied, however, an adjuster would gain nothing by closing a claim, as any *increase* in "closures" would automatically *decrease* the corresponding "year-end closing ratio." For example, if an adjuster had five "intake" claims and "closed" one, her "closing ratio" would be 500% pursuant to this equation. On the other hand, if the adjuster closed all five claims, her closing ratio would be 100%. Plaintiff presents no evidence explaining this anomaly or illustrating how the program was enforced or administered.

12

adjuster to meet the program's requirements.[3] In fact, Thompson testified the program was "never presented" to her. (Doc. 100-6 at 5–6). In any event, even if the program was unreasonable, Defendant's actions do not amount to "aggravated, outrageous, oppressive or fraudulent" conduct necessary to create a triable issue for the jury. *See Rawlings*, 151 Ariz. at 162, 726 P.2d at 578.[4]

Second, Plaintiff claims that Defendant actively pursued an attorney who would "support any reason, no matter how illegitimate, to deny [Plaintiff's] claim." (Doc. 98 at 7). Initially, there is no evidence that Defendant did not have a continuous, subjective belief in the merits of its denial of Plaintiff's claim. At the outset, Thompson denied Plaintiff's claim because she doubted medical causation and believed that the injury did not occur in the course and scope of his employment. (Doc. 95-3 at 46–47). The issue of medical causation remained a concern for both of Defendant's retained attorneys, Doherty (*id.* at 99–100) and Houston (*id.* at 119, 145). Finally, when Dr. Rockowitz was apprised of Plaintiff's sworn testimony regarding the incident, he too questioned medical causation. (Doc. 99 at 10). Plaintiff presents no evidence that Defendant's continuous subjective belief in the merits of its denial was motivated by an "evil mind" or that Defendant consciously disregarded a substantial risk that its conduct might significantly

---

[3] To support his argument that Defendant placed arbitrary and unreasonable pressure on claims adjusters to deny claims, Plaintiff presents the Court with e-mails sent by Starwood to Thompson and other claim adjusters. The e-mails intimated that the adjusters should "focus on closing" certain claims, including Plaintiff's, "before the end of the year." (Doc. 100-17). The e-mails do not, however, equate "closing" a claim with "denying" a claim, much less prove that Defendant consciously disregarded a substantial risk of significant harm to Plaintiff's rights. While these e-mails may be evidence of bad faith, they do not create a dispute of material fact on the issue of punitive damages.

[4] The Court finds that *Nardelli v. Metro Grp. Prop. & Cas. Ins. Co.*, 230 Ariz. 592, 277 P.3d 789 (Ct. App. 2012) is inapplicable to Plaintiff's claim. In *Nardelli*, the Arizona Court of Appeals was presented with evidence that an insurance company implemented an "aggressive company-wide profit goal" and "aggressively communicated this goal to the claims department (including the office and employees handling [the plaintiff's] claim)." *Id.* at 605, 277 P.3d at 802. The evidence also showed that the monetary benefits given to the claims office were tied to the "average amount paid on claims." *Id.* Plaintiff presents no similar evidence here.

injure Plaintiff's rights. While reasons for "dilatory" resolution of a claim may ultimately be found "groundless or inadequately investigated" resulting in bad faith liability, this does not mean that such reasons are sufficient to create an issue of fact for the jury on punitive damages. *Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 599, 734 P.2d 76, 84 (1987). "Something more" is required; Plaintiff failed to produce such evidence here.

Plaintiff's final argument is that Defendant engaged in misconduct when Houston had a second conversation with Dr. Rockowitz to "persuade[] him to change his position to support Zurich's denial of the claim." (Doc. 98 at 7).[5] Plaintiff presents no evidence to support this allegation. On the other hand, Houston testified that the purpose of the conversation was to inform Dr. Rockowitz of Plaintiff's ICA testimony regarding the mechanism of injury. (Doc 104-1 at 22).[6] Without evidence of "something more," Houston's ancillary conversation with Dr. Rockowitz to determine the credibility of a

---

[5] Plaintiff also appears to argue that Houston's initial scheduling of the IME with Dr. Rockowitz constituted illicit conduct. (Doc. 98 at 2, 7). Plaintiff, however, fails to recognize that no IME had been performed at this time. Without evidence of bad faith or unreasonableness, an insurer acts within its rights by scheduling a preliminary IME. *See* Ariz. Rev. Stat. § 23-1026 (2015); Ariz. Admin. Code § R20-5-114 (2013); *Mendoza v. McDonald's Corp.*, 222 Ariz. 139, 159, 213 P.3d 288, 308 (Ct. App. 2009) (implying that seeking an IME is not automatically bad faith). Moreover, Plaintiff's attempt to create a material fact dispute by citing a letter expressing Houston's "hope[ that] Dr. Rockowitz will support our argument" is not enough. (Doc. 99 at 7). No reasonable juror could conclude that a party's mere "hope" for a certain outcome is sufficient to support a finding of "aggravated, outrageous, malicious or fraudulent" conduct by clear and convincing evidence.

[6] The evidence Plaintiff cites for his argument that this conversation was nefarious actually bolsters Houston's testimony. *See* (Doc. 100-22 at 3). Namely, the evidence shows that after Houston learned for the first time that Plaintiff's arm was not extended when he fell, he wrote to Thompson that "this piece of evidence will be critical to Dr. Rockowitz. . . . I will arrange for a telephonic conference with Dr. Rockowitz to see if this changes his opinion regarding the rotator cuff tear noted." (*Id.*) Plaintiff presents no evidence that Dr. Rockowitz already knew of the mechanism of the injury, nor does the IME report suggest as much. *See* (Doc. 115). Rather, the evidence aligns with Houston's testimony that he merely wanted to know whether Plaintiff's testimony would have a bearing on Dr. Rockowitz's prior opinion.

14

1  viable defense was not "aggravated, outrageous, malicious or fraudulent" conduct as
2  required for punitive damages. *See Rawlings*, 151 Ariz. at 162, 726 P.2d at 578.[7]

### V.     Conclusion

The Court concludes that the evidence presented does not warrant a reasonable inference that Defendant acted with an "evil mind" mandated by Arizona law to establish punitive damages. While Plaintiff's evidence may rise to the level of bad faith liability, no evidence exists from which a reasonable juror could conclude that Defendant knew of the evil of its actions, or that it acted from spite, or that Defendant's conduct was so outrageous that it presented an unacceptable risk of tremendous harm to Plaintiff.[8] The

---

[7] Plaintiff argues that *Demetrulias v. Wal-Mart Stores, Inc.*, 917 F. Supp. 2d 993 (D. Ariz. 2013) directly resembles Plaintiff's claim and should be followed. In *Demetrulias*, however, the plaintiff offered significantly more evidence to support her punitive damages claim than Plaintiff does here. In particular, the plaintiff in *Demetrulias* offered evidence that her supervisor falsely told the IME physician that there was surveillance footage demonstrating her ability to work. *Id.* at 1011. Plaintiff offers no similar evidence here.

[8] The Court does not find *Newman v. Select Specialty Hosp.-Ariz., Inc.*, No. 1 CA-CV 13-0665, 720 Ariz. Adv. Rep. 12, 2015 Ariz. App. LEXIS 174 (Ct. App. Sept. 1, 2015) to be applicable to this case. In *Newman*, the Arizona Court of Appeals reversed the trial court's decision to grant a hospital defendant's motion for a directed verdict on the issue of punitive damages. *Id.* at ¶ 15. The plaintiff, a hospital patient, had presented evidence at trial that the hospital was aware of the plaintiff's injuries and required treatment, had internal policies imposing a detailed course of conduct on hospital personnel, failed to follow direct treatment orders from the plaintiff's doctor, and was consciously aware that failing to uphold the treatment standards risked severely exacerbating the plaintiff's condition. *Id.* at ¶ 13. Despite this knowledge, the hospital "continued to pursue a course of conduct that could severely exacerbate [the plaintiff's] wounds." *Id.* at ¶ 14.

In this case, the evidence Plaintiff presents simply does not show by clear and convincing evidence that Defendant consciously disregarded a substantial risk of significant harm to Plaintiff when it denied Plaintiff's claim. Specifically, in contrast with *Newman* where the hospital knew that a substantial risk of significant harm to the plaintiff was the patent consequence of disregarding the doctor's treatment orders and the hospital's mandatory protocols, the evidence of a substantial risk of significant harm was absent in this case. Dr. Shafer's initial surgery authorization request noted that surgery would provide Plaintiff "the best chance to improve his pain and maximize his function both short-term and long-term." (Doc. 95-3 at 73). Simply suggesting that a treatment

1  Court, therefore, will grant Defendant's motion for summary judgment as to the punitive
2  damages claim.
3     For the foregoing reasons,
4     **IT IS ORDERED** that Defendant's Motion to Strike Portions of the Declaration
5  of Everette Lee Herndon, Jr. (Doc. 106) is denied.
6     **IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment
7  Re: Punitive Damages (Doc. 94) is granted.
8     Dated this 25th day of September, 2015.

James A. Teilborg
Senior United States District Judge

---

27  option is a patient's "best chance," however, is not equivalent to pronouncing that a
28  "significant risk of substantial harm" will result by foregoing the treatment. The Court is not willing to make this stretch to uncover a material fact dispute for the jury.